

**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>DOUBLE JUMP, INC.,<br><br>Debtor. | BAP No. NV-23-1162-BCL<br><br>Bk. No. 3:19-bk-50102-gs |
| SANDRA SARKISSIAN, SUCCESSOR TRUSTEE OF THE SAM SARKISSIAN AND SANDRA SARKISSIAN LIVING TRUST DATED SEPTEMBER 4, 1997,<br>Appellant,<br>v.<br>CHRISTINA W. LOVATO, Chapter 7 Trustee,<br>Appellee. | Adv. No. 3:21-ap-05026-gs<br><br>**MEMORANDUM**\* |

Appeal from the United States Bankruptcy Court
for the District of Nevada
Gary A. Spraker, Bankruptcy Judge, Presiding

Before: BRAND, CORBIT, and LAFFERTY, Bankruptcy Judges.

## INTRODUCTION

Appellant Sandra Sarkissian, Successor Trustee of the Sam Sarkissian and Sandra Sarkissian Living Trust Dated September 4, 1997 ("Sarkissian"),[1] appeals an order granting summary judgment to appellee, Christina W.

---

\* This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] We refer to Ms. Sarkissian and the family trust as "Sarkissian."

1

Lovato, chapter 7[2] trustee ("Trustee Lovato"), and denying summary judgment to Sarkissian for the estate's fraudulent transfer/avoidance claim against Sarkissian. That the transfer was fraudulent and avoidable was not disputed; the only dispute was whether Trustee Lovato could recover from Sarkissian without violating the single satisfaction rule under § 550(d). The bankruptcy court concluded that she could. We AFFIRM.

## FACTS

**A.    Prepetition events**

The material facts are undisputed. In February 2018, Sarkissian entered into an agreement with Jeff and Paulette Carpoff for the sale of a warehouse in California for $8 million. To purchase the warehouse, the Carpoffs caused their then-owned California business, DC Solar Solutions, Inc. ("DC Solar"), to transfer to Sarkissian a down payment of $2,387,335.34 (the "Transfer"). The Carpoffs obtained a loan through their special purpose entity – 2750 Maxwell Way, LLC ("Maxwell LLC") – for the remaining $5.6 million from CTBC Bank, secured by the warehouse. When the sale closed, title to the warehouse was transferred to Maxwell LLC. Unbeknownst to Sarkissian, the warehouse purchase was part of an eight-year, $1 billion Ponzi scheme perpetrated by the Carpoffs through DC Solar and other Carpoff entities.

---

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, all "Rule" references are to the Federal Rules of Bankruptcy Procedure, and all "Civil Rule" references are to the Federal Rules of Civil Procedure.

The federal government raided DC Solar and other Carpoff entities' headquarters in California in December 2018. Besides valuable personal property, at least 41 real properties owned by the Carpoffs or their entities were purchased with fraud proceeds.

## B. Postpetition events

### 1. The bankruptcy filings

Between January 31 and February 5, 2019, DC Solar and nine other Carpoff entities filed for chapter 11 bankruptcy in Reno, Nevada, in the master case captioned: *In re Double Jump, Inc.*, No. 19-bk-50102. Four of the entities make up the DC Solar bankruptcy; six of the entities are California LLC's (the "California LLC debtors") which held title to the multiple real properties and make up the Dora Dog bankruptcy. Several Carpoff entities owning real property did not file for bankruptcy including Maxwell LLC, which owned the warehouse. When the bankruptcy court later converted the cases to chapter 7, Trustee Lovato was appointed as trustee to the DC Solar bankruptcy; W. Donald Gieseke ("Trustee Gieseke") was appointed as trustee to the Dora Dog bankruptcy.

### 2. The forfeiture actions and warehouse sale

Shortly after the bankruptcy filings, the United States filed two in rem forfeiture actions in California against the multiple properties and entities connected to the Carpoffs' fraud. The first action included 25 real properties and the six California LLC debtors ("Forfeiture I"); the second action included 14 real properties, some of the California LLC debtors, and some nondebtor

3

Carpoff entities ("Forfeiture II") (together, the "Forfeiture Actions"). Forfeiture II included the warehouse and Maxwell LLC.

Trustee Gieseke contested the Forfeiture Actions by seeking an order to enforce the automatic stay, but Trustee Lovato did not take any such action. Unlike the California LLC debtors which were defendants in the Forfeiture Actions and whose estates were being administered by Trustee Gieseke in the Dora Dog bankruptcy, the DC Solar debtors were not defendants in the Forfeiture Actions as their estates did not own any of the forfeited properties, although DC Solar was used as a means to purchase most, if not all, of them.

The United States later sold the warehouse to a third party for $8.3 million. CTBC Bank was paid its $5.6 million debt from the proceeds.

### 3.      The coordination agreement

Prior to the warehouse sale, Trustee Gieseke began negotiating a "Coordination Agreement" with the United States to address the real properties in the Forfeiture Actions and their competing claims to some of those properties. Trustee Lovato was not involved in those negotiations. After the Coordination Agreement was substantially finalized, Trustee Lovato was informed that her signature was required to effectuate it. She reviewed the document, made no material changes, and signed it.

Broadly speaking, the Coordination Agreement resolved the dispute between the United States and Trustee Gieseke over the 39 real properties in the Forfeiture Actions, allocating 31 to the United States to liquidate and eight to Trustee Gieseke to administer in the Dora Dog bankruptcy. No properties

4

were allocated to Trustee Lovato. The Coordination Agreement's recitals stated in relevant part:

> (a) the United States and "the Chapter 7 Trustees seek to (i) resolve their respective claims to the Forfeiture I, Forfeiture II, and other properties addressed herein; (ii) maximize recovery to victims and creditors; and (iii) minimize expenses through the coordination of their respective efforts for the victims and creditors."

> (b) "there is a significant overlap of identity between victims of the fraud and creditors of the DC Solar, California LLCs and Carpoff-related entities currently in Chapter 7 proceedings in Reno, Nevada, and competing litigation would result in the overall diminishment of the recovery for all victims and creditors alike as well as undue delay in the distribution of assets."

> (c) "the United States and the Chapter 7 Trustees desire to minimize litigation risk, unnecessary cost, and undue delay, and to compromise and resolve their respective claims to property identified in the Forfeiture I and II actions and certain additional property addressed herein."

The parties to the Coordination Agreement agreed in part:

> (a) the United States "will forfeit [i.e., recover] the *In Rem* Defendant real properties [including the warehouse], and will liquidate those assets for the benefit of the victims of the criminal fraud . . . ."

> (b) the "Chapter 7 Trustees specifically acknowledge, agree, and stipulate that the real property [including the warehouse] is forfeitable to the [United States] . . . and that the bankruptcy estates have no claim or right to that property or any net equity arising from its liquidation or ongoing management[.]"

> (c) "in exchange for the consideration set forth herein and except as otherwise provided . . . the [United States] agrees it shall not

5

pursue forfeiture of, or any claim on or to, any additional real or personal property owned by Double Jump, the DC Solar Entities, or the California LLCs[.]"

Trustee Lovato moved for approval of the Coordination Agreement in the DC Solar bankruptcy. She explained that because DC Solar's funds were used to purchase the forfeited properties, she had filed $30 million in claims in the Dora Dog bankruptcy, and DC Solar's estate would receive whatever funds remained from sales by Trustee Gieseke after satisfying all debts against those properties. The bankruptcy court approved the Coordination Agreement in both the DC Solar and the Dora Dog bankruptcies; the district court approved it for the United States.

### 4. The adversary proceeding and cross motions for summary judgment

Trustee Lovato filed an adversary complaint against Sarkissian, seeking to avoid and recover the Transfer. Trustee Lovato alleged that, in furtherance of their Ponzi scheme, the Carpoffs caused DC Solar to pay the nearly $2.4 million down payment to Sarkissian for the warehouse for which DC Solar received no value or benefit. Trustee Lovato alleged that the Transfer was both an actual and constructive fraudulent transfer avoidable under § 548(a)(1)(A) and (B), and recoverable under § 550(a).

Trustee Lovato then moved for summary judgment ("MSJ"). Sarkissian did not dispute that DC Solar made the Transfer (1) with the actual intent to hinder, delay, or defraud creditors (based on the Carpoffs' admitted Ponzi scheme); (2) while insolvent; and (3) for which it received zero value in

6

exchange; and that (4) Sarkissian was the initial transferee. Trustee Lovato argued that, because § 550(a)(1) is a strict liability statute, she could recover from Sarkissian the property transferred or its value, which, in this case, was the same since the Transfer was cash.

Sarkissian opposed the MSJ and filed a cross motion for summary judgment ("Cross MSJ"), arguing that, as a matter of law, Trustee Lovato could not recover the Transfer from her because it would be a double recovery barred by § 550(d). Sarkissian argued that the Coordination Agreement was Trustee Lovato's single satisfaction permitted by the statute. Sarkissian argued that, by trading her claims to the warehouse and surrendering her right to pursue Sarkissian in exchange for the right to pursue her own claims in the DC Solar bankruptcy without government interference, Trustee Lovato received the full value for the warehouse. Further, the government recovered the $2.4 million paid by DC Solar. Consequently, argued Sarkissian, Trustee Lovato received her single recovery of the value of the Transfer, and seeking to recover the same $2.4 million from Sarkissian constituted a double recovery, violating § 550(d).

Trustee Lovato disputed Sarkissian's double recovery argument. She argued that the "single satisfaction defense" was inapplicable for two reasons: (1) it did not apply under the plain language of § 550(d); and (2) because she had not "recovered" any of the $2.4 million Transfer and the estate's claim against Sarkissian was not "satisfied" by the Coordination Agreement. Trustee Lovato argued that § 550(d) limits application of the single

7

satisfaction defense to situations where the trustee has already achieved a recovery under § 550(a) and its seven triggering statutes (§§ 544, 545, 547, 548, 549, 553(b), and 724(a)). But that did not occur here; the Coordination Agreement was not achieved under § 550(a).

Further, argued Trustee Lovato, Sarkissian had not met her burden to show that Trustee Lovato recovered the debt from another source via the Coordination Agreement, which was a multi-faceted agreement addressing many entities, properties, rights, and claims without meaningfully tying any one item to another. It identified the warehouse as only 1 of 39 parcels of real property without distinction, did not identify or mention the Transfer or any other fraudulent transfer claims, and addressed jointly the two trustees overseeing 10 bankruptcy estates. Nothing in the Coordination Agreement, continued Trustee Lovato, connected any benefit to her regarding the fraudulent transfer/avoidance claim or supported an argument that such claim against Sarkissian was satisfied, or that Trustee Lovato achieved any relevant recovery. The government's non-interference with the administration of the estate, argued Trustee Lovato, did not constitute a recovery of the Transfer or satisfaction of Sarkissian's $2.4 million obligation. Rather, her only means to recover on the fraudulent transfer claim was through the adversary proceeding.

Trustee Lovato argued that, contrary to Sarkissian's position, she had no claim to the warehouse to relinquish in exchange for the government's agreement not to interfere with the DC Solar bankruptcy, and even if she did,

8

relinquishing any such claim would not satisfy her fraudulent transfer claim. Trustee Lovato argued that she received only two benefits in the Coordination Agreement, which Trustee Gieseke also received: (1) an agreement that the United States would not pursue forfeiture of, or any claim to, any real or personal property owned by the DC Solar entities or the California LLC debtors not allocated to the United States; and (2) access to documents seized by the United States. Trustee Lovato argued that what she and Trustee Gieseke gave up was: (1) any right to file a claim or petition for, or otherwise contest the forfeiture of, any properties in the Forfeiture Actions; and (2) any estate claims or rights to the 31 properties allocated to the United States or any net equity from their liquidation. Trustee Lovato maintained that any waiver of her potential claims was not related to the forfeited properties, but to claims against the government for restitution.

After a hearing, the bankruptcy court entered its oral ruling on the cross motions for summary judgment, granting the MSJ and denying the Cross MSJ. The court later entered an order and judgment consistent with its oral ruling, awarding Trustee Lovato a judgment of $2,733,920.93 (including prejudgment interest) against Sarkissian. Sarkissian timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

9

## ISSUES

1.  Did the bankruptcy court err in granting the MSJ?

2.  Did the bankruptcy court err in denying the Cross MSJ?

## STANDARDS OF REVIEW

We review de novo the bankruptcy court's summary judgment ruling. *Ulrich v. Schian Walker, P.L.C. (In re Boates)*, 551 B.R. 428, 433 (9th Cir. BAP 2016). A bankruptcy court's conclusions of law, including its interpretation of a contract and the Code, are also reviewed de novo. *Flores v. Am. Seafoods Co.*, 335 F.3d 904, 910 (9th Cir. 2003) (interpretation of a contract); *Reswick v. Reswick (In re Reswick)*, 446 B.R. 362, 365 (9th Cir. BAP 2011) (interpretation of the Code). De novo means that our review is independent, with no deference given to the bankruptcy court's conclusions. *First Ave. W. Bldg., LLC v. James (In re Onecast Media, Inc.)*, 439 F.3d 558, 561 (9th Cir. 2006).

## DISCUSSION

### A. Summary judgment standards

Summary judgment is appropriately granted where review of the relevant record establishes that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Civil Rule 56(a), applicable in adversary proceedings under Rule 7056; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "When the material facts are not in dispute, our only function is to determine whether the bankruptcy court correctly applied the law." *Patow v. Marshack (In re Patow)*, 632 B.R. 195, 202 (9th Cir.

BAP 2021) (citation omitted), *aff'd*, No. 21-60051, 2022 WL 2256325 (9th Cir. June 23, 2022).

## B.  Avoidance and recovery of estate property generally

When a bankruptcy court avoids a fraudulent transfer under § 548, the trustee may recover for the benefit of the estate either "the property transferred" or "the value of such property" from the "initial transferee," the "entity for whose benefit such transfer was made," or any "immediate or mediate transferee" of the initial transferee. § 550(a)(1), (2).

"Generally, the purpose of § 550(a) is to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred." *Aalfs v. Wirum (In re Straightline Invs., Inc.)*, 525 F.3d 870, 883 (9th Cir. 2008) (cleaned up). Per § 550(d), the "trustee is entitled to only a single satisfaction" under § 550(a), not to a double recovery or windfall. *See id.* at 883 & n.3; *Loo v. Martinson (In re Skywalkers, Inc.)*, 49 F.3d 546, 549 (9th Cir. 1995) (applying the "single satisfaction" rule under § 550(c) [now (d)] to a debtor's recovery of both a liquor license and payments made to procure that license); *see also Freeland v. Enodis Corp.*, 540 F.3d 721, 740 (7th Cir. 2008) (recognizing that a trustee can recover from any combination of the entities mentioned in § 550(a) subject to the limitation of a "single satisfaction").

## C.  The bankruptcy court did not err in granting the MSJ and denying the Cross MSJ.

Sarkissian conceded that the Transfer of the $2.4 million DC Solar paid towards the warehouse purchase made for the benefit of Maxwell LLC was

avoidable under § 548(a)(1), and that she was liable as the initial transferee under § 550(a)(1). The only dispute was whether the Coordination Agreement satisfied the fraudulent transfer/avoidance claim against Sarkissian and constituted a recovery of the value of the Transfer by Trustee Lovato under § 550(a). If it did, then allowing a separate recovery against Sarkissian was an impermissible double recovery and violated § 550(d).

Sarkissian reasoned that Trustee Lovato recovered the "value" of the Transfer by releasing her claims and rights to certain properties including the warehouse, which the United States sold for $8.3 million, in exchange for other properties and the government's release of its claims and rights in those properties and its agreement not to interfere in the DC Solar bankruptcy. Sarkissian argued that, because Trustee Lovato opted for that exchange of value, she exhausted her single-satisfaction remedy, and seeking to recover the same $2.4 million the government already recovered from the warehouse liquidation violated § 550(d).

The bankruptcy court disagreed, determining that the Coordination Agreement did not constitute a satisfaction of the fraudulent transfer/ avoidance claim against Sarkissian or a recovery of the value of the Transfer by Trustee Lovato under § 550(a), and therefore Trustee Lovato could recover from Sarkissian. Sarkissian argues that this was error. While the bankruptcy court focused more on a trustee's discretion as to which parties she or he can seek to recover from under § 550(a), we interpret the Coordination Agreement to be neither a satisfaction of the DC Solar estate's fraudulent

12

transfer/avoidance claim against Sarkissian nor a recovery of the value of the Transfer by Trustee Lovato under § 550(a).

When applying federal contract law,[3] the court considers first the plain language of the contract. *See Doe 1 v. AOL LLC,* 552 F.3d 1077, 1081 (9th Cir. 2009) ("When we interpret a contract under federal law, we look for guidance to general principles for interpreting contracts.") (cleaned up), *overruled on other grounds by Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49 (2013). "Contract terms are to be given their ordinary meaning, and when the terms of a contract are clear, the intent of the parties must be ascertained from the contract itself." *Id.* (citation omitted).

To be clear, the Transfer here was the $2.4 million in cash paid by DC Solar as the down payment for the warehouse; it was not the warehouse. Sarkissian continues to focus on the warehouse, but the DC Solar estate had no rights to the warehouse itself, which was owned by nondebtor Maxwell LLC. The only "rights" the DC Solar estate had respecting the warehouse were fraudulent transfer/avoidance claims against Maxwell LLC, the entity for whose benefit the Transfer was made, and Sarkissian, the initial transferee. Hence, Trustee Lovato did not, and could not, give up any rights to the warehouse itself.

In any case, Sarkissian's position fails for several reasons. First, her argument is contrary to the plain language of § 550(d). That provision applies

---

[3] The Coordination Agreement did not contain a choice-of-law provision, so we apply federal law.

13

only when the trustee has already avoided and recovered a transfer under § 550(a) and one of its triggering sections. *45 John Lofts, LLC v. Meridian Cap. Grp. LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 749 (Bankr. S.D.N.Y. 2019). Sarkissian has not shown that the Coordination Agreement was an avoidance and recovery by Trustee Lovato under § 550(a). Certainly, the Coordination Agreement was not achieved under § 550(a).

Sarkissian has also not shown that the DC Solar estate's fraudulent transfer/avoidance claim was satisfied by, or that Trustee Lovato recovered the value of the Transfer from, the Coordination Agreement. To sustain a defense based on § 550(d)'s prohibition of double recovery by a trustee, Sarkissian had the burden "to show clearly" that Trustee Lovato recovered the Transfer from another party. *Sarachek v. Luana Sav. Bank (In re Agriprocessors, Inc.)*, 547 B.R. 292, 322 (N.D. Iowa 2016) (citations omitted), *aff'd*, 859 F.3d 599 (8th Cir. 2017); *accord White v. Jones (In re Butler Innovative Sols., Inc.)*, No. 08-00065, 2015 WL 1926814, at *6 (Bankr. D.D.C. Apr. 27, 2015) (reasoning that defendant should bear the burden to prove the single satisfaction defense under § 550(d)). Nothing in the Coordination Agreement suggests that Trustee Lovato released fraudulent transfer/avoidance claims against any party including Sarkissian, or that she received any benefit satisfying such claims. The focus of the Coordination Agreement was to divide up the many real properties seized by the government in the Forfeiture Actions, some of which were also assets of the Dora Dog estate and none of which were assets of the DC Solar estate. The benefit Trustee Lovato received in exchange for

14

her general release to those properties was largely the promise of no interference from the government in the DC Solar bankruptcy. Sarkissian has failed to show how this fully satisfied, or even reduced, her $2.4 million obligation to the DC Solar estate.

Further, Sarkissian's "single satisfaction" argument is contrary to the plain language of the Coordination Agreement. The United States expressly agreed that it would not pursue forfeiture of, or any claim on or to, any property – real or personal – not expressly accounted for in the Coordination Agreement. Thus, such personal property, including any causes of action the DC Solar or Dora Dog estates held against others, was allocated to the bankruptcy estates. Hence, the Coordination Agreement did not satisfy any fraudulent transfer/avoidance claims against Sarkissian and others because Trustee Lovato did not release any such claims. Nor did the Coordination Agreement impair Trustee Lovato's ability to seek recovery for an admitted fraudulent transfer from the initial transferee.

Finally, it is a logical leap to say that Trustee Lovato recovered $2.4 million when Sarkissian has failed to even quantify the value of what Trustee Lovato received in the Coordination Agreement. She certainly did not receive any money. As the bankruptcy court pointed out, the United States would have forfeited the warehouse without the Coordination Agreement because Maxwell LLC was a nondebtor. The proceeds from the warehouse liquidation did not, and would never, inure to the benefit of the DC Solar estate. Consequently, those proceeds could not be applied under a theory of double

15

recovery to claims that independently existed, and the Coordination Agreement had no effect on that outcome.

Put simply, the recovery of the warehouse by the United States is not the same as the estate's recovery of the $2.4 million Transfer from Sarkissian. Even though there is some overlap of creditors in both the Forfeiture Actions and the DC Solar and Dora Dog bankruptcies, the United States and Trustees Lovato and Gieseke are different plaintiffs with different claims, and the Coordination Agreement did not affect or preclude Trustee Lovato's avoidance claim against Sarkissian or her ability to recover the $2.4 million from Sarkissian on behalf of the DC Solar estate.

Sarkissian argues that the bankruptcy court improperly focused on Trustee Lovato's intent or purpose for entering into the Coordination Agreement – or rather, the absence of express language in that document – to determine that its purpose had nothing to do with the avoidance action against Sarkissian. Sarkissian argues that even if the Coordination Agreement expressly included the avoidance claims, it made no difference to the outcome: the Coordination Agreement still satisfied the fraudulent transfer/ avoidance claim and constituted a single recovery under § 550(a), because Trustee Lovato obtained the value of the Transfer in exchange for the release of the warehouse. As we noted above, the DC Solar estate had no rights to the warehouse itself, so Trustee Lovato purportedly "releasing" that property had no consequence or value to her. And, for the reasons we have already stated, Sarkissian has not shown that whatever value Trustee Lovato received from

16

the Coordination Agreement was sufficient to satisfy the DC Solar estate's $2.4 million claim against Sarkissian.

Because Trustee Lovato had not previously recovered on the DC Solar estate's fraudulent transfer/avoidance claim by the Coordination Agreement, her recovery action against Sarkissian was not an impermissible double recovery in violation of § 550(d). Accordingly, the bankruptcy court did not err in granting the MSJ and denying the Cross MSJ.

## CONCLUSION

For the reasons stated above, we AFFIRM.